UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| _____ ) | |
| ) | |
| FEDERAL TRADE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. _____ |
| ) | |
| MIDWEST RECOVERY SYSTEMS, ) | |
| LLC, a limited liability company, ) | |
| ) | |
| BRANDON M. TUMBER, individually ) | |
| and as an officer of Midwest Recovery ) | |
| Systems, LLC, ) | |
| ) | |
| KENNY W. CONWAY, individually and ) | |
| as an officer of Midwest Recovery ) | |
| Systems, LLC, and ) | |
| ) | |
| JOSEPH H. SMITH, individually and as ) | |
| an officer of Midwest Recovery ) | |
| Systems, LLC ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**COMPLAINT FOR PERMANENT INJUNCTION
AND OTHER EQUITABLE RELIEF**

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint

alleges:

1.      The FTC brings this action under Sections 5(a), 5(m)(1)(A), 13(b), and 19 of the

FTC Act, 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), and 57b; Section 814 of the Fair Debt

Collection Practices Act ("FDCPA"), 15 U.S.C. §1692*l*; and Section 621(a) of the Fair Credit

Reporting Act ("FCRA"), 15 U.S.C. § 1681s(a), to obtain permanent injunctive relief, rescission

or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten

monies, and other equitable relief for Defendants' acts and practices in violation of the FTC Act, 15 U.S.C. § 45(a), the FDCPA, 15 U.S.C. §§ l692-l692p, the FCRA, 15 U.S.C. §§ 1681-1681x, and Regulation V, Subpart E—Duties of Furnishers of Information ("Furnisher Rule"), 12 C.F.R. §§ 1022.40-1022.43, issued pursuant to Section 623(e)(1) of the FCRA, 15 U.S.C. § 1681s-2(e)(1).

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a)(1), 53(b), 1681s(a), and 1692*l*.

3.      Venue is proper in the United States District Court for the Eastern District of Missouri under 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the FDCPA, 15 U.S.C. §§ 1692-1692p, which prohibits abusive, deceptive, and unfair debt collection practices; the FCRA, 15 U.S.C. §§ 1681-1681x, which imposes duties upon consumer reporting agencies ("CRAs") and those who furnish information to a CRA or use information obtained from a CRA; and pursuant to the FCRA, the Furnisher Rule, 12 C.F.R. §§ 1022.40-1022.43, regarding the duties of furnishers of information to CRAs.

5.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act, the FDCPA, the FCRA and the Furnisher Rule, and to secure such equitable relief as may be appropriate in each case, including rescission or

reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 57b.

## DEFENDANTS

6.      Defendant Midwest Recovery Systems, LLC. ("Midwest Recovery") is a Missouri limited liability company with its principal place of business at 514 Earth City Plaza, Suite 100, Earth City, MO 63045.  Midwest Recovery transacts or has transacted business in this district.

7.      Defendant Brandon M. Tumber is a co-owner of Midwest Recovery.  At times material to this Complaint, he has been the President of Midwest Recovery, and, acting alone or in concert with others, has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Midwest Recovery, including the acts and practices set forth in this Complaint.  Defendant Tumber resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

8.      Defendant Kenny W. Conway is a co-owner of Midwest Recovery.  At times material to this Complaint, he has been the Chief Executive Officer of Midwest Recovery, and, acting alone or in concert with others, has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Midwest Recovery, including the acts and practices set forth in this Complaint.  Defendant Conway resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

9.      Defendant Joseph H. Smith is a co-owner of Midwest Recovery.  At times material to this Complaint, he has been the Chief Operating Officer of Midwest Recovery, and,

acting alone or in concert with others, has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Midwest Recovery, including the acts and practices set forth in this Complaint.  Defendant Smith resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

10.     Defendants Tumber, Conway, and Smith are co-owners of Midwest Recovery, and each has served as members of Midwest Recovery's Operations Management Team, Compliance Management Team, Executive Advisory Board, and Executive Committee.  In addition, all three individuals have signed data furnishing contracts with a CRA, performed collection activities on behalf of the company, and developed and approved company policies on collection operations, including those regarding complaint logging and handling.  Under their leadership, Midwest has received thousands of consumer disputes per month.

## COMMERCE

11.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' COERCIVE AND ILLEGAL COLLECTION PRACTICES

12.     Defendants have operated a third-party debt collection business that pursues consumers for alleged debts, including debts that consumers do not actually owe.  Defendants collect phantom payday lending debts, purported medical debts, and other debts that Defendants are consistently unable to verify.  Since at least 2015, Defendants have reported to CRAs more than $98 million in unauthorized or counterfeit payday loans, debts subject to unresolved fraud claims, debts in bankruptcy, debts in the process of being re-billed to a consumer's medical

4

insurance, and even debts that consumers already paid to Defendants.  Defendants have continued to collect millions of dollars' worth of these alleged debts despite being inundated with thousands of consumer complaints each month.

13.     Defendants have collected such debts using "debt parking" or "passive debt collection"—a practice wherein Defendants add alleged debts to consumers' credit reports without first attempting to communicate with consumers about the debts.  Consumers often do not discover these purported debts until they threaten to interfere with an important, time-sensitive transaction, such as buying a home or a car or applying for a job.  Defendants have continued to collect these debts even after receiving multiple red flags that these debts were invalid.  Indeed, when consumers have been able to dispute the existence of these purported debts, Defendants have regularly concluded that 80-97% of disputed debts are either inaccurate or invalid.  Defendants have obtained an estimated $24.3 million in gross revenues as a result of their unlawful debt collection practices.

### False or Unsubstantiated Claims that Consumers Owe Debts

14.     Defendants have collected on numerous debts that consumers do not owe or that Defendants are not authorized to collect.

15.     For example, since at least 2015, Defendants have collected tens of thousands of unauthorized or counterfeit payday loan debts.  These debts include phantom loans—in which money is deposited into consumers' bank accounts without their permission and then larger amounts are withdrawn as "finance charges" without consumers' consent—as well as counterfeit debts fabricated from consumers' sensitive financial information.

16.     In addition, Defendants have sought and accepted payment from consumers for other debts they could not substantiate at the time of collection, including where Defendants' own documents have indicated one of the following:

      a.  Defendants were unable to validate the debt;

      b.  The debt was the subject of an unresolved fraud claim;

      c.  Defendants had received a bankruptcy notice regarding the debt; or

      d.  The debt was medical debt in the process of being re-billed to the consumer's medical insurance.

17.     Accuracy issues are a particular concern in the case of medical debts, which are a growing segment of the debt collection industry.  Over 43 million consumers have outstanding medical debts on their credit reports, and medical debts make up more than half of the debts reported by third-party collection companies.  Medical billing and the resulting debt are often a source of confusion and uncertainty for consumers because of the complex, opaque system of insurance coverage and cost sharing.

18.     Defendants have continued to collect on purported debts even after individual consumers told them that they had never heard of the lenders or did not owe debts, and in some cases provided bank statements or other records to prove that these debts were not owed or were discharged in bankruptcy.  In some cases, Defendants appear to have re-reported consumers' debts to credit reporting agencies after previously removing them from the consumers' credit reports, including after the consumers paid Defendants for the debt or after Defendants assured consumer the debts would be removed from their credit reports.

19.     Each month, Defendants have received thousands of consumer complaints and disputes.  Each month, Defendants have determined between 80% and 97% of disputed debts to

be inaccurate or invalid upon investigation.  These invalid or inaccurate debts amount to millions

of dollars of debt each month that Defendants had attempted to collect from consumers.   The

Better Business Bureau ("BBB") also has notified Defendants of hundreds of complaints

alleging, *inter alia*, collection on debts not owed, and recently revoked their accreditation for

failing to "[c]ooperate with BBB in efforts to eliminate the underlying cause of patterns of

customer complaints that are identified by BBB."  Defendants also were informed by one CRA

that, in response to consumer complaints, Defendants were "submitting a significant amount of

delete responses per month," which the agency noted raised issues regarding the "integrity of the

data."

20.    Defendants have received more than 24,000 disputes specifically relating to debts

originated by Joel Tucker—whose debts were notorious in the debt-collection industry for being

unauthorized or counterfeit and have been the subject of numerous FTC enforcement actions.

For example, in 2014, the FTC sued the purported lender of the unauthorized debts.  *E.g.*, *FTC v.

CWB Services, et al.*, 4:14-cv-00783 (W.D. Mo. filed Sept. 5, 2014).  In 2016, in an FTC action

against Tucker himself, the court found that Tucker had sold counterfeit debt portfolios

consisting of fabricated loans.  *See FTC v. Tucker et al.*, No. 2:16-cv-02816 (D. Kan. filed Dec.

16, 2016), ECF No. 69 at *3.  The FTC has also sued other debt collectors who, like Defendants,

collected on debts distributed by Tucker. *See, e.g., FTC v. Hylan Asset Mgmt., LLC, et al.*, No.

1:18-cv-00710 (W.D.N.Y. filed June 26, 2018).

21.    Defendants could not or did not verify over 87% of these disputed Tucker debts.

Nonetheless, Defendants continued to collect on Tucker debt portfolios, including by parking

these debts on consumers' credit reports.

22.     Despite the persistent inaccuracies, Defendants continued to collect on unauthorized debts.  Even in specific portfolios where they have found large numbers of inaccuracies, Defendants have taken no steps to evaluate the accuracy of the remaining information they are reporting in those portfolios, correcting only problems with individual debts in response to individual consumer disputes.

### Unfair Collections and Inadequate Safeguards

23.      Despite these widespread accuracy issues, in numerous instances, the first step in Defendants' collection process is to furnish debt information to CRAs, including Equifax, Experian, and Transunion, for inclusion in consumers' credit reports.  Defendants do not tell consumers that they have reported the debts to the CRAs.  Without such notification, consumers often are unaware that Defendants are reporting negative information about them, and consumers cannot verify that the debts are accurate before they appear on their reports.

24.     Many consumers first learn that Defendants have placed a purported debt on their credit report when they apply for new credit, housing, or employment provided by an entity that relies on consumer reports or credit scores.  When consumers contact Defendants about these debts, because they are inaccurate or to obtain additional information, Defendants inform them that they must pay the debts in full in order to have them removed from their credit reports.  Consumers who need a clean bill of credit are thus faced with a dilemma: either pay the debts and move forward with their transaction or file a dispute and risk not being able to obtain a mortgage or job or desired product or service.

25.     In numerous instances, consumers who do not owe or do not recognize the debts Defendants included in their credit reports have had financial transactions such as home-buying

delayed or jeopardized by Defendants' practice of debt parking.  Consumers also have

experienced significant drops in their credit scores because of this practice.

26.     For example, one consumer reported that a purported $1500 medical debt

Midwest reported to CRAs had caused his credit score to drop by 35 points, thereby endangering

his pending mortgage application.  Although Midwest asserted that the debt was owed—and

threatened to sue if he did not pay—the consumer contacted the medical provider and learned

that he only owed an $80 copay.  The consumer paid that amount, but Midwest still asserted that

the full $1500 was due and that the consumer would be sued if he did not pay.

27.     Even when Defendants do communicate with consumers—due to consumer-

initiated outreach or otherwise—in numerous instances, Defendants also have failed to inform

consumers, orally in their initial communication with the consumer or in writing within five days

of the initial oral communication, of (1) the amount of the debt; (2) the name of the creditor to

whom the purported debt is owed; (3) a statement that unless the consumer disputes the debt, the

debt will be assumed valid; (4) a statement that if the consumer disputes all or part of the debt in

writing within 30 days, the debt collector will obtain verification of the debt and mail it to the

consumer; and (5) a statement that, upon the consumer's written request within the 30-day

period, the debt collector will provide the name and address of the original creditor, if different

from the current creditor.

28.     This disclosure is required by the Fair Debt Collection Practices Act, which

Congress enacted, in part, to "eliminate the recurring problem of debt collectors dunning the

wrong person or attempting to collect debts which the consumer has already paid."  S. Rep. No.

95-382, at *4 (1977), reprinted in 1977 U.S.C.C.A.N. 1695, 1699.  Because Defendants furnish

information to CRAs before communicating with consumers, consumers have no ability to

challenge the validity of the debt using the FDCPA's procedures before the debt is placed on their credit reports.

29.     In numerous instances, Defendants have failed to conduct an investigation of consumers' direct disputes.  Defendants' stated policy upon receiving a direct dispute is to request validation documents from their client.  However, in numerous instances Defendants did not request validation documents regarding direct disputes that consumers submitted to them.

30.     Furthermore, except in cases where state law requires it, if Defendants' clients— the owners of the purported debts—cannot provide them with validation documents, Defendants delete the account information from the disputing consumer's credit report but do not notify the consumer of this deletion or the results of their investigation.  As a result, these consumers are left in the dark; they do not know if they must take additional steps to resolve the issue that led to the dispute, and they may need to pay for access to their credit reports in order to find out.

31.     Consumers cannot reasonably avoid Defendants' unlawful collection activities. In the case of phantom or counterfeit debts, for example, consumers are not aware that their personal information has been misappropriated and used to create an unauthorized or fictitious obligation.  From the portfolios, debt collectors, including Defendants, obtain consumers' private personal information and sensitive financial information, such as Social Security numbers, bank account numbers, and names of references.  Debt collectors may then recite such information to consumers to convince them that the purported loan is legitimate or that the collectors will be able to coerce the consumers to pay, even if they do not legitimately owe the loan. Some consumers who question the validity of the debt may pay it, even if they believe they do not owe it, because disputing the debt can be a lengthy process without guaranteed results, and because these consumers were unaware of the debt until time was of the essence for their credit to be

clear.  Other consumers may pay higher interest rates or fees for credit, or be denied credit or employment, either because they refuse to pay a questionable debt or because they never discover that the debt has altered their apparent creditworthiness.

**Defendants' Unlawful Activities Are Ongoing**

32.     Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the FTC, including the FTC Act, the FDCPA, the FCRA, and the Furnisher Rule.

**<u>VIOLATIONS OF THE FTC ACT</u>**

33.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

34.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

**Count I**
**False or Unsubstantiated Claims that Consumers Owe Debts**

35.     In numerous instances, in connection with the collection of debts, Defendants have represented, directly or indirectly, expressly or by implication, that:

> a.     The consumer is delinquent on a medical, payday loan, or other debt that Defendants have the authority to collect; or
>
> b.     The consumer has a legal obligation to pay Defendants.

36.     The representations set forth in Paragraph 35 are false or misleading or were not substantiated at the time the representations were made.

37.     Therefore, the making of the representations as set forth in Paragraph 35 of this Complaint constitutes a deceptive act or practice, in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## <u>VIOLATIONS OF THE FDCPA</u>

38.     In 1977, Congress passed the FDCPA, 15 U.S.C. §§ 1692-1692p, which became effective on March 20, 1978, and has been in force since that date.  Under Section 814 of the FDCPA, 15 U.S.C. § 1692*l*, a violation of the FDCPA is deemed an unfair or deceptive act or practice in violation of the FTC Act.  Further, the FTC is authorized to use all of its functions and powers under the FTC Act to enforce compliance with the FDCPA, including Section 19 of the Act, 15 U.S.C. § 57b.

39.     Defendants are "debt collectors" as defined by Section 803(6) of the FDCPA, 15 U.S.C. § 1692a(6).  They regularly attempt to collect debts asserted to be owed or due another.

40.     A "consumer," as defined in Section 803(3) of the FDCPA, 15 U.S.C. § 1692a(3), "means any natural person obligated or allegedly obligated to pay any debt."

41.     A "debt," as defined in Section 803(5) of the FDCPA, 15 U.S.C. § 1692a(5), "means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment."

42.     Midwest Recovery is a third-party debt collector that collects on behalf of medical providers, payday lenders, and other consumer creditors.

### Count II
### False or Misleading Collection Representations

43.     In numerous instances, in connection with the collection of debts, Defendants have, directly or indirectly, expressly or by implication, used false, deceptive, or misleading representations or means, in violation of Section 807 of the FDCPA, 15 U.S.C. § l692e, including, but not limited to:

12

a.      Falsely representing the character, amount, or legal status of any debt, in

violation of Section 807(2)(A) of the FDCPA, 15 U.S.C. § l692e(2)(A);

b.      Communicating to any person credit information which is known or which

should be known to be false, in violation of Section 807(8); and

c.      Using false representations or deceptive means to collect or attempt to

collect a debt or to obtain information concerning a consumer, in violation of

Section 807(10) of the FDCPA, 15 U.S.C. § 1692e(10).

**Count III**
**Unfair Collection Practices**

44.     In numerous instances, in connection with the collection of debts, Defendants

have, directly or indirectly, used unfair or unconscionable means to collect or attempt to collect,

including by furnishing information regarding a debt to a consumer reporting agency before

communicating with the consumer about the debt, in violation of Section 808 of the FDCPA, 15

U.S.C. § 1692f.

**Count IV**
**Failure to Provide Validation Notice**

45.     In numerous instances, in connection with the collection of debts, Defendants

have failed to send consumers, within five days after the initial communication with consumers,

a written notice containing (1) the amount of the debt; (2) the name of the creditor to whom the

debt is owed; (3) a statement that unless the consumer, within thirty days after receipt of the

notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be

valid by Defendants; (4) a statement that if the consumer notifies Defendants in writing within

the thirty-day period that the debt, or any portion thereof, is disputed, Defendants will obtain

verification of the debt or a copy of a judgment against the consumer and a copy of such

verification or judgment will be mailed to the consumer by Defendants; and (5) a statement that, upon the consumer's written request within the thirty-day period, Defendants will provide the consumer with the name and address of the original creditor, if different from the current creditor, in violation of Section 809(a) of the FDCPA, 15 U.S.C. § 1692g(a).

## VIOLATIONS OF THE FCRA AND FURNISHER RULE

46.     The FCRA was enacted in 1970, became effective on April 25, 1971, and has been in force since that date.  The Fair and Accurate Credit Transactions Act, Pub. L. No. 108-159, 117 Stat. 1952, amended the FCRA in December 2003, and the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, amended the FCRA in July 2010.

47.     Section 621 of the FCRA, 15 U.S.C. § 1681s, authorizes the Commission to use all of its functions and powers under the FTC Act to enforce compliance with the FCRA by all persons subject thereto except to the extent that enforcement specifically is committed to some other governmental agency, irrespective of whether the person is engaged in commerce or meets any other jurisdictional tests set forth by the FTC Act.

48.     The FCRA imposes obligations on CRAs that assemble and evaluate consumer reports, furnishers of information to CRAs, and those that obtain information from CRAs.  The FCRA required the FTC to establish regulations to implement requirements for furnishers.  The FTC published the Furnisher Rule, regulations related to furnishers, at 16 C.F.R. § 660.  In July 2011, the Dodd-Frank Act transferred rulemaking authority under the FCRA to the CFPB, and the CFPB republished the Part 660 regulations at 12 C.F.R. § 1022, at Subpart E and Appendix E to Part 1022.  The FTC enforces the CFPB regulations with respect to entities over which the FTC has jurisdiction under the FCRA.

49.     Defendants regularly furnish consumer account information to major CRAs. Accordingly, Defendants are a "furnisher of information" under the FCRA, 15 U.S.C. § 1681s-2(a)(2)(A), and are required to comply with the Furnisher Rule.

50.     The Furnisher Rule requires furnishers to conduct a reasonable investigation of disputes they receive from consumers concerning the accuracy of reported credit information ("direct disputes") and report the results of the investigation to consumers within the same time period as mandated for CRA investigations of disputes, which is generally 30 days, 12 C.F.R. § 1022.43(e)(1) and (e)(3).

### Count V
### Furnishing Inaccurate Information

51.     Section 623(a)(1)(A) of the FCRA, 15 U.S.C. § 1681s-2(a)(1)(A), prohibits a person from furnishing information relating to any consumer to a consumer reporting agency if the person knows or has reasonable cause to believe the information is inaccurate.

52.     In numerous instances in connection with furnishing information relating to a consumer to a consumer reporting agency, Defendants have furnished such information while knowing or having reasonable cause to believe that the information was inaccurate.

53.     The acts and practices alleged in Paragraph 51 constitute violations of Section 623(a)(1)(A) of the FCRA, 15 U.S.C. § 1681s-2(a)(1)(A).

54.     Pursuant to Section 621(a)(1) of the FCRA, 15 U.S.C. § 1681s(a)(1), the acts and practices described in Paragraph 51 also constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a)

## Count VI
## Failure to Conduct a Reasonable Investigation of Direct Disputes

55.     Through the acts and practices described in Paragraph 29, in numerous instances, Defendants, after receiving direct disputes from consumers, as that term is defined in the Furnisher Rule at 12 C.F.R. § 1022.41(b), have failed to conduct a reasonable investigation of the direct disputes.

56.     By and through the acts and practices described in Paragraph 29 and 55, Defendants have violated Section 623(a)(8)(E)(i) of the FCRA, 15 U.S.C. § 1681s-2(a)(8)(E)(i), and 12 C.F.R. § 1022.43(e)(1).

57.     Pursuant to Section 621(a)(1) of the FCRA, 15 U.S.C. § 1681s(a)(1), the acts and practices described in Paragraphs 29 and 55 also constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count VII
## Failure to Report Results of Investigation

58.     Through the acts and practices described in Paragraph 30, Defendants, after receiving direct disputes from consumers, as that term is defined in the Furnisher Rule at 12 C.F.R. § 1022.41(b), have failed to report the results of the investigation to the consumer before the expiration of the period prescribed by Section 611(a)(1) of the FCRA, 15 U.S.C. § 1681i(a)(1).

59.     By and through the acts and practices described in Paragraphs 30 and 58, Defendants have violated Section 623(a)(8)(E)(iii) of the FCRA, 15 U.S.C. § 1681s-2(a)(8)(E)(iii), and 12 C.F.R. § 1022.43(e)(3).

60.     Pursuant to Section 621(a)(1) of the FCRA, 15 U.S.C. § 1681s(a)(1), the acts and practices described in Paragraphs 30 and 58 also constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

61.     Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the FDCPA, the FCRA, and the Furnisher Rule.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

62.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

63.     Section 19 of the FTC Act, 15 U.S.C. § 57b, authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FDCPA, including the rescission or reformation of contracts, and the refund of money.

## PRAYER FOR RELIEF

64.     Wherefore, the FTC, pursuant to Sections 5(a), 13(b), and 19 of the FTC Act, 15

U.S.C. §§ 45(a), 53(b), and 57b, Section 814(a) of the FDCPA, 15 U.S.C. § 1692*l*(a), Section

621(a) of the FCRA, 15 U.S.C. § 1681s(a), and the Court's own equitable powers, requests that

the Court:

A.     Award the FTC such injunctive and ancillary relief as may be necessary to avert

the likelihood of consumer injury during the pendency of this action and to preserve the

possibility of effective final relief;

B.     Enter a permanent injunction to prevent future violations of the FTC Act, the

FDCPA, the FCRA, and the Furnisher Rule by Defendants;

C.     Award such relief as the Court finds necessary to redress injury to consumers

resulting from Defendants' violations of the FTC Act, FDCPA, the FCRA, and the Furnisher

Rule, including rescission or reformation of contracts, restitution, the refund of monies paid, and

the disgorgement of ill-gotten monies; and

D.     Award the FTC the costs of bringing this action, as well as such other and

additional relief as the Court may determine to be just and proper.


Dated:  November 25, 2020                    Respectfully submitted,


                                             FEDERAL TRADE COMMISSION

                                             ALDEN F. ABBOTT
                                             General Counsel

                                             /s/ Daniel Dwyer_____
                                             DANIEL DWYER #286701(CA)
                                             CHRISTOPHER LEACH
                                             KATHERINE WHITE

18

Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
Telephone: 202-326-2957 (Dwyer)
Telephone: 202-326-2394 (Leach)
Telephone: 202-326-2878 (White)
Facsimile: 202-326-3768
Email: ddwyer@ftc.gov; cleach@ftc.gov;
kwhite@ftc.gov


Attorneys for Plaintiff
FEDERAL TRADE COMMISSION